IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE IMMUCOR, INC.<br>SECURITIES LITIGATION | CIVIL ACTION FILE<br>NO. 1:09-CV-2351-TWT |

ORDER

This is a securities fraud action. It is before the Court on the Defendants' Motion to Dismiss the Amended Complaint [Docs. 94, 108], which is GRANTED, and the Defendants' Motion to Supplement the Motion to Dismiss [Doc. 99], which is GRANTED.

I. Introduction

Immucor supplies hospital blood banks, clinical laboratories, and blood donation centers with blood reagents. The Plaintiff alleges that Immucor made false and misleading statements regarding its compliance with FDA regulations and its participation in an illegal price-fixing scheme in violation Section 10(b) of the Securities Exchange Act of 1934. It also names Gioacchino De Chirico, Ralph Eatz, and Edward Gallup as Defendants pursuant to Section 20(a) of the Act.

A.     FDA Allegations

Blood reagents are used to detect and identify certain properties of human blood. All facilities that manufacture blood reagents must be licensed by the FDA. Each facility license is issued for an indefinite period of time and may be revoked at the agency's discretion. As part of its regulatory responsibility, the FDA conducts unannounced inspections of licensed facilities. In March 2006, the FDA inspected the Immucor facility in Norcross, Georgia, and reported thirteen violations. The following August, Immucor filed its annual report on Form 10-K with the SEC. It disclosed that the FDA had observed minor violations during an unannounced inspection and reported that it had "responded to the observations in April 2006." (Defs.' Mot. to Dismiss, Appx. Tab. B at 10.) Immucor also stated in the 10-K that it "believe[d] that its manufacturing and on-going quality control procedures conform[ed] to the required statutes, regulations, and standards." Id.

In January 2008, the FDA returned to the Norcross facility. This time, it reported fifteen violations, including several recurring violations that Immucor had not fixed since the previous inspection. Shortly thereafter, the FDA issued a warning letter to Immucor, advising the company that "failure to promptly correct [the violations] may result in regulatory action without further notice." (Am. Compl. ¶ 230.) Immucor disclosed the warning letter in a May 2008 press release and said that

the company was "working diligently to respond to the FDA as soon as possible." (Defs.' Mot. to Dismiss, Appx. Tab. E.) That July, Immucor filed its 2008 10-K with the SEC. Again, Immucor stated that it "believe[d] that [its] manufacturing and on-going quality control procedures conform[ed] to the required statutes, regulations and standards." (Am. Compl. ¶ 243.)

The following January, the FDA returned to the Norcross facility for another unannounced inspection. Again, it reported numerous violations, including recurring violations that Immucor had not fixed since the January 2008 inspection. Based on its inspection, the FDA issued a notice of intent to revoke ("NOIR") Immucor's biologics license with respect to two blood reagent products. Immucor disclosed the notice in a June 2009 press release and said that the company had been "working diligently to improve [its] quality systems and processes, including the deficiencies emphasized by the FDA." (Defs.' Mot. to Dismiss, Appx. Tab. G.) In light of the recurring FDA violations and the June 2009 NOIR, the Plaintiff alleges that Immucor's statements regarding its commitment to quality and its compliance with FDA regulation are false and misleading.

    B.    <u>Antitrust Allegations</u>

Immucor's main competitor in the blood reagent industry is Ortho-Clinical Diagnostics. Beginning in 2000, both companies raised the prices of blood reagent

products by up to 300 percent. Around the same time, both companies cancelled contracts with large group purchasing organizations. Based in part on the companies' parallel price increases, the FTC and DOJ initiated investigations into whether Immucor and Ortho had agreed to fix the prices of blood reagent products in violation of federal antitrust laws. Meanwhile, Immucor had released a number of statements maintaining that it operated in a "competitive environment" with "aggressive price competition" and attributing the company's "record" profits to "traditional reagent price increases." (Am. Compl. ¶ 110.) The Plaintiff says that these statements were false and misleading in light of the alleged price-fixing scheme between Immucor and Ortho.

## II. Motion to Dismiss Standard

A complaint should be dismissed if, even accepting all well-pleaded factual allegations as true, it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Complaints that allege fraud under federal securities law must satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act of 1995. Rule 9(b) requires a complaint to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral

representations, who made the statements, the time and place of the statements, the content of the statements and manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud." In re Theragenics Corp. Securities Litigation, 105 F. Supp. 2d 1342, 1348 (N.D. Ga. 2000) (citing Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997)).

### III. Discussion

#### A. Section 10(b) Claims

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j. Pursuant to § 10(b), the Securities Exchange Commission promulgated Rule 10b-5, which prohibits, among other things, the making of any "untrue statement of material fact." 17 C.F.R. § 240.10b-5. In a typical § 10(b) private action, the plaintiff must show (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008); Robbins v. Koger Properties, 116 F.3d 1441, 1447 (11th Cir. 1997). Here, Immucor

says that the Plaintiff fails to adequately plead four of these elements - a material misrepresentation or omission, scienter, economic loss, and loss causation.

## 1. FDA Allegations

### a. Material Misrepresentations or Omissions

The Plaintiff alleges that Immucor's statements regarding its commitment to quality and its belief that the company was in compliance with FDA regulations constitute material misrepresentations under Rule 10b-5. It also alleges that Immucor's failure to disclose its noncompliance constitutes an actionable omission in light of Immucor's statements regarding the highly-regulated nature of the blood reagent industry.

Immucor argues that the statements regarding its commitment to quality are statements of "corporate optimism." Statements of "corporate optimism" are not typically actionable "because reasonable investors do not rely on them in making investment decisions." Amalgamated Bank v. The Coca-Cola Co., No. 05-cv-1226, 2006 WL 2818973, at *3 (N.D. Ga. Sept. 29, 2006). That is not the case here. Because Immucor's facility licenses were subject to revocation by the FDA, Immucor's assurances about the company's commitment to quality were more than puffery or self-congratulatory corporate optimism that could be disregarded by reasonable investors. Instead, it appears that the statements were designed to reassure

investors in light of the highly-regulated nature of the blood reagent industry and Immucor's poor performance at FDA investigations.

Immucor also argues that the statements regarding its "belief" that the company's "manufacturing and ongoing quality control procedures" were in compliance with FDA regulations were forward-looking statements protected by the PLSRA safe harbor. The Court disagrees. The word "ongoing" coupled with the statements' use of the present tense implies that the statements reference quality control procedures already in place. And prefacing otherwise non-forward-looking statements with the word "believes" does not bring the statements within the PLSRA safe harbor. Accordingly, Immucor's FDA-related allegations are sufficient to allege a material misrepresentation or omission under Rule 10b-5.

      b.    <u>Scienter</u>

To adequately allege scienter, a plaintiff must "plead with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." <u>Mizzaro v. Home Depot, Inc.</u>, 544 F.3d 1230, 1238 (11th Cir. 2008). A "strong inference" is an inference that is "cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 310 (2007).

Here, the Plaintiff alleges that the individual Defendants knew Immucor's statements regarding quality control procedures and compliance with FDA regulations were false but made them anyway. The Plaintiff points to internal documents, FDA reports, and confidential witness statements to support these allegations. For example, the Plaintiff alleges that at least one of the individual Defendants participated in each of the FDA inspections and post-inspection meetings and received FDA reports. The Plaintiff also alleges that the individual Defendants received quarterly metric reports identifying quality issues and FDA violations occurring at the Norcross facility between FDA inspections. According to the complaint, CW1, a former Vice President of Quality at Immucor, said that the quality-related issues that led to the NOIR were repeatedly documented in the metric reports that were distributed to Defendants Eatz and De Chirico. The complaint also alleges that CW1 said that the individual Defendants regularly ignored quality issues despite knowing about the company's repeated FDA violations. Together, these allegations are sufficient to support a strong inference that the Defendants were severely reckless when they made the allegedly misleading statements.

    c.  <u>Economic Loss and Loss Causation</u>

Loss causation is the causal link between the alleged misrepresentation and the economic loss suffered as a result. In effect, this element requires the plaintiff to

allege that the security's share price "fell significantly after the truth became known." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005). Here, the Plaintiff alleges that the price of Immucor stock fell in May 2008 immediately following the disclosure of the FDA warning letter and in June 2009 immediately following the disclosure of the FDA NOIR. However, the Plaintiff does not allege that it owned Immucor stock before the May 2008 disclosure, or that it sold Immucor stock following the June 2009 disclosure. Moreover, it appears that the share price quickly rebounded to pre-disclosure levels after each of the FDA-related disclosures. For example, before the May 2008 disclosure, the share price of Immucor stock was $27.96. Immediately following the disclosure, the share price fell to $26.70. Two months after the disclosure, however, the price had risen to $28.16, and three months after the disclosure, the price was $32.52.[1] (Defs.' Mot. to Dismiss, Appx. Tab. P.) Likewise, before the June 2009 disclosure, the share price of Immucor stock was $16.09. After the disclosure, the share price fell to $13.80. However, less than one month after the disclosure, the share price had rebounded to $16.41, and three months after the disclosure, the price had risen to $17.26. Id. Because the Plaintiff could have sold its shares for a profit in the months following the FDA-related disclosures, it cannot show

---

[1]The Court may take judicial notice of stock prices on a motion to dismiss a § 10(b) claim. La Grasta v. First Union Sec., 358 F.3d 840, 842 (11th Cir. 2004).

actual economic loss or loss causation. See Ross v. Walton, 668 F. Supp. 2d 32, 43 (D.D.C. 2009) ("[T]he Court is unaware of any authority in which actual economic loss was found when the stock value returned to pre-disclosure prices and could have been sold at a profit just after the class period.").

        2.      Antitrust Allegations

            a.      Material Misrepresentation or Omission

The Plaintiff also alleges that Immucor engaged in an illegal price-fixing scheme with Ortho-Clinical Diagnostics in violation of U.S. antitrust laws and says that the company's failure to disclose its illegal acts constitutes a material misrepresentation under Rule 10b-5. Where false or misleading statements are based on the failure to disclose illegal activity, the allegations about the underlying illegal activity must also be stated with particularity. In re Mirant Corp. Sec. Litig., No. 1:02-CV-1467, 2009 WL 48188, at * 17 (N.D. Ga. Jan. 7, 2009). Immucor says that the Plaintiff has not done this. The Plaintiff alleges the following facts in support of its antitrust allegations:

- Immucor acquired most of its competitors between 1994, creating a highly concentrated market in the blood reagent industry.

- Immucor incurred significant debt during its acquisition spree and needed to raise the prices of its blood reagent products in order to increase profits.

- CW2 prepared a pricing analysis in Summer 2000 showing that Immucor could increase its prices by up to 15% without losing customers to Ortho, but De Chirico and Gallup "dismissed [the analysis] with amusement."

- In Fall 2000, Ortho announced that it would raise its prices. Shortly thereafter, Immucor received Ortho's unpublished price list. The list showed price increases of up to 300% for some products.

- When Ortho implemented the price changes, Immucor increased its prices by similar amounts. Over the next few years, the companies continued to implement parallel price increases. For example, in late 2004, Immucor and Ortho raised the prices of certain blood reagents between 87% and 254%.

- The companies also cancelled major group purchasing organization contracts at the same time. For example, Immucor asked two GPOs - Premier and Novation - to agree to a 105-110% price increase that September. The organizations refused, and Immucor cancelled the GPO contracts. The same month, Ortho asked Premier to agree to a 110% price increase. It refused, and Ortho cancelled the GPO contract.

- At least two senior executives at Ortho took jobs at Immucor around the time of the alleged price-fixing agreement.

- The DOJ and FTC investigated Immucor and Ortho. The DOJ investigation was closed with no findings of wrongdoing.

The Plaintiff does not even attempt to allege facts showing an explicit agreement between anyone at Immucor and Ortho to fix prices for their products. The Plaintiff's allegations at most amount to "conscious parallelism" which the Eleventh Circuit has described as "synchronous actions" that are the product of "a rational, independent calculus by each member of the oligopoly, as opposed to collusion." Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1299 (11th Cir. 2003). Evidence of

such conscious parallelism alone is not enough to infer a price fixing conspiracy. Id. at 1301. An inference of innocent parallelism is equally plausible. Therefore, the Plaintiff has not adequately plead a cause of action for securities fraud arising out of failure to disclose an antitrust price fixing conspiracy.

### b.    Loss Causation

The Plaintiff alleges that Immucor's share price fell 9.36% in October 2007 immediately after the company disclosed that the FTC had formally requested documents and information related to a non-public investigation into whether the company had violated federal antitrust laws. The Plaintiff further alleges that Immucor's share price fell 27% in April 2009 after the company disclosed that it had received a subpoena from the DOJ requesting documents related to an antitrust violation. Because the Plaintiff purchased Immucor stock in February and March 2009, it says that it suffered an actual economic loss as a result of Immucor's misrepresentations. These allegations are sufficient to withstand a motion to dismiss.

### B.    Section 20(a) Claims

Section 20(a) of the Securities Exchange Act of 1934 creates liability for a "controlling person" where Section 10(b) violation is found. 15 U.S.C. § 78t(a). "To show control person liability under Section 20(a), a plaintiff must allege that the company violated § 10(b); (2) the defendant had the power to control the general

affairs of the company; and (3) the defendant had the power to control the specific corporate policy that resulted in the primary violation." In re Spectrum Brands, Inc. Securities Litigation, 461 F. Supp. 2d 1297, 1307 (N.D. Ga. 2006). "Allegations of control are not subject to the Rule 9(b) particularity requirement, since fraud is not an element of control person liability." Tippens v. Round Island Plantation LLC, No. 09-CV-14036, 2009 WL 2365347, at *10 (S.D. Fla. July 31, 2009). There can be no Section 20(a) liability when the substantive claims have been dismissed.

## IV.  Conclusion

For the reasons stated above, the Defendants' Motion to Dismiss the Amended Complaint [Docs. 94, 108] is GRANTED and the Defendants' Motion to Supplement the Motion to Dismiss [Doc. 99] is GRANTED.

SO ORDERED, this 30 day of June, 2011.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge